1
2
3
4

SEYFARTH SHAW LLP
Daniel Whang (SBN 223451)
dwhang@seyfarth.com
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021
Telephone:  (310) 277-7200
Facsimile:  (310) 201-5219

5
6
7
8

SEYFARTH SHAW LLP
Gina Gi (SBN 266708)
ggi@seyfarth.com
601 South Figueroa Street, Suite 3300
Los Angeles, California 90017-5793
Telephone:   (213) 270-9600
Facsimile: (213) 270-9601

9
10

Attorneys for Defendant
FLOOR AND DECOR OUTLETS OF
AMERICA, INC.

11

UNITED STATES DISTRICT COURT

12

CENTRAL DISTRICT OF CALIFORNIA

13

14
15

RIKKI SALDIVAR and FRANCISCO
ALEMAN, individually, and on behalf of
all others similarly situated,

16

Plaintiffs,

17

v.

18
19

FLOOR AND DECOR OUTLETS OF
AMERICA, INC.; and DOES 1 through 10,
inclusive,

20

Defendants.

21
22
23
24
25
26
27
28

Case No. 2:26-cv-00714-ODW-MARx

**MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION TO
COMPEL ARBITRATION AND TO
DISMISS PLAINTIFFS' CLASS
ACTION CLAIMS**

*[Filed Concurrently with Notice of
Motion; Declaration of Mandi Donovan;
Declaration of Cindy Quinonez;
Declaration of Justin Mescall;
Declaration of Gina Gi; and [Proposed]
Order]*

---

MEMORANDUM OF POINTS AND AUTHORITIES

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................1

II.   FACTUAL BACKGROUND................................................................................2

    A.    Plaintiffs Entered Into an Agreement Requiring Arbitration of All Employment-Related Disputes With F&D ........................................................2

    B.    Plaintiffs Commenced This Action and Refused to Arbitrate .......................3

    C.    Aleman's Duties .............................................................................................3

    D.    Saldivar's Duties ...........................................................................................5

III.  LEGAL ARGUMENT..........................................................................................7

    A.    The FAA And U.S. Supreme Court Provide For Enforcement Of Agreements To Arbitrate ................................................................................7

    B.    The FAA Applies to Employment Contracts Involving Interstate Commerce ......................................................................................................8

        1.    The Parties Entered Into a Valid Arbitration Agreement that Covers the Claims ...............................................................................9

        2.    Plaintiffs' Claims Are Within The Scope Of The Arbitration Agreement .............................................................................................9

    C.    The Transportation Workers' Exemption Does Not Apply to Plaintiffs ........9

        1.    The Transportation Worker Exemption Is Narrow..............................10

        2.    Plaintiffs Are Retail Workers, Not Transportation Workers .............10

        3.    Plaintiffs Are Not Actively Engaged in Interstate Commerce As The Products They Handled Have Come to Rest ...............................11

    D.    The Arbitration Agreement Is Procedurally and Substantively Conscionable ...............................................................................................16

        1.    The Arbitration Agreement provides for a neutral arbitrator. ...........16

        2.    The Arbitration Agreement provides for adequate discovery. ...........17

        3.    The Arbitration Agreement provides for a written arbitration award. .................................................................................................17

        4.    The Arbitration Agreement does not limit remedies. ........................17

        5.    The Arbitration Agreement does not impose additional costs for Plaintiff.............................................................................................17

i

323070277v.4

6.    The Arbitration Agreement is bilateral. ...................................18

E.    The Arbitration Agreement Is Not Unconscionable ....................................18

1.    Plaintiffs cannot establish procedurally unconscionability. ...............18

2.    Plaintiffs cannot establish substantive unconscionability. .................19

3.    Any unconscionable terms can be severed. ........................................20

F.    The Class Allegations Must Be Dismissed Because The Arbitration
Agreement Contains A Valid Class Action Waiver.....................................20

IV.    CONCLUSION.....................................................................................................21

MEMORANDUM OF POINTS AND AUTHORITIES

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Adkins v. Labor Ready, Inc.*,
303 F.3d 496 (4th Cir. 2002)...................................................................13

*Allied-Bruce Terminix Cos., Inc. v. Dobson*,
513 U.S. 265 (1995)..................................................................................8

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011)....................................................................7, 8, 16, 21

*Bissonnette v. LePage Bakeries Park St., LLC*,
601 U.S. 246 (2024)..................................................1, 10, 11, 15

*Capriole v. Uber Technologies, Inc.*,
7 F.4th 854 (2021) ...................................................................14

*Chiron Corp. v. Ortho Diagnostic Sys.*,
207 F.3d 1126 (9th Cir. 2000) ................................................9

*Circuit City Stores, Inc. v. Adams*,
532 U.S. 105 (2001)..................................................8, 10, 11

*Epic Sys. Corp. v. Lewis*,
138 S. Ct. 1612 (2018)...............................................................20

*Fomby v. CSC ServiceWorks, Inc.*,
2024 WL 3580824 (N.D. Cal. July 29, 2024) ...........................12

*Hill v. Rent-A-Ctr., Inc.*,
398 F.3d 1286 (11th Cir. 2005) ...............................................15

*Immediato v. Postmates, Inc.*,
54 F.4th 67 (1st Cir. 2022).................................................11, 12, 15

*Lenz v. Yellow Transp., Inc.*,
431 F.3d 348-350 (8th Cir. 2005)............................................13

*Lopez v. Cintas Corp.*,
47 F.4th 428 (5th Cir. 2022)....................................................14

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983)......................................................................8

*Perry v. Thomas*,
482 U.S. 483 (1987).................................................................7

*Rittman v. Amazon.com, Inc.*,
971 F. 3d 904 (9th Cir. 2020)....................................................15

iii

MEMORANDUM OF POINTS AND AUTHORITIES

*Romero v. Watkins & Shepard Trucking, Inc.,*
2020 WL 5775180 (C.D. Cal. July 10, 2020)................................................................. 10

*Shelton v. Delivery Drivers, Inc.,*
2023 WL 2629027 (C.D. Cal. Jan. 31, 2023)................................................................. 12

*Shugars v. Walmart Inc.,*
2025 WL 786348 (N.D. Cal. March 2025)........................................................ 12, 15, 16

*Southwest Airlines Co. v. Saxon,*
596 U.S. 450 (2022)....................................................................................... 10, 11, 14

*In re Tesla Employee Data Breach Litigation,*
2025 WL 315416 (N.D. Cal. Jan. 2025)........................................................................ 14

**State Cases**

*24 Hour Fitness v. Super. Ct.,*
66 Cal. App. 4th 1199 (1998) ....................................................................................... 18

*Armendariz v. Foundation Health Psychare Services, Inc,*
24 Cal. 4th 83 (2000) .................................................................................... 16, 17, 18, 20

*Betancourt v. Transportation Brokerage Specialists, Inc.,*
62 Cal. App. 5th 552 (2021) ......................................................................................... 10

*Fittante v. Palm Springs Motors, Inc.,*
105 Cal. App. 4th 708 (2003) ....................................................................................... 18

*Giuliano v. Inland Empire Pers., Inc.,*
149 Cal. App. 4th 1276 (2007) ....................................................................................... 8

*Lagatree v. Luce, Forward, Hamilton & Scripps,*
74 Cal. App. 4th 1105 (1999) ....................................................................................... 18

*McManus v. CIBS World Mkt. Corp.,*
109 Cal. App. 4th 76 (2003) ......................................................................................... 18

*Nieto v. Fresno Beverage Co., Inc.*
33 Cal. App. 5th 274 (2019) ......................................................................................... 10

*Omar v. Ralphs Grocery Co.,*
118 Cal. App. 4th 955 (2004) ......................................................................................... 9

*Villa Milano Homeowners Ass'n. v. Il Davorge,*
84 Cal. App. 4th 819 (2000) ......................................................................................... 19

*Walnut Producers of California v. Diamond Foods, Inc.,*
187 Cal. App. 4th 634 (2010) ....................................................................................... 19

**Federal Statutes**

9 U.S.C. § 2 ............................................................................................................ 8, 15

9 U.S.C. § 3 ................................................................................................................. 8

iv

MEMORANDUM OF POINTS AND AUTHORITIES

9 U.S.C. § 4 ........................................................................................................ 8

FAA § 1 ................................................................................................ 9, 10, 11

Federal Arbitration Act ................................................................................ *passim*

National Labor Relations Act ............................................................................ 20

**State Statutes**

Cal. Civ. Proc. Code §§ 1281.85-1281.96 .................................................... 16

California Business and Professions Code § 17200 *et seq*. .......................... 1, 9

Civil Code § 1599 .............................................................................................. 20

Civil Code § 1670.5(a) ...................................................................................... 20

**Rules**

Cal. Rules of Court, Rules 6-12 ...................................................................... 17

MEMORANDUM OF POINTS AND AUTHORITIES

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

It is undisputed that Plaintiffs RIKKI SALDIVAR ("Saldivar") and FRANCISCO ALEMAN ("Aleman") (collectively "Plaintiffs") each signed an arbitration agreement (the "Arbitration Agreement" or "Agreement") covering "any dispute, cause of action, claim, or controversy . . . that arose out of or is in any way related to the employment relationship or the termination thereof" with Floor and Decor Outlets of America, Inc. ("F&D").  The Agreement specifically provides that claims subject to arbitration include, but are not limited to, claims under the California Labor Code, the California Wage Orders, and the California Business and Professions Code section 17200 *et seq*.  All of Plaintiffs' California Labor Code and unlawful business practices ("UCL") claims (all of which are predicated on California Labor Code claims) fall squarely within the scope of the Agreement.

Plaintiffs were retail store associates, not transportation workers, and thus clearly do not fall under the class of workers considered exempt from arbitration under the Federal Arbitration Act ("FAA"). Applying the transportation exemption to retail workers like Plaintiffs would defy binding U.S. Supreme Court precedent specifically disclaiming that the transportation exemption covers "all workers who load or unload goods—from pet shop employees to grocery store clerks."  *Bissonnette v. LePage Bakeries Park St., LLC* ("*Bissonnette*"), 601 U.S. 246, 256 (2024).  Far from being "actively engaged in transportation of goods across borders via the channels of foreign or interstate commerce," *id.*, as the narrow transportation exemption requires, Plaintiffs' retail roles exist to serve local customers who visit F&D retail stores to view, become inspired by, sample, and ultimately purchase hard surface flooring and related products.

The Arbitration Agreement is enforceable, no exception to arbitrability applies, and Plaintiffs must be compelled to arbitration.

MEMORANDUM OF POINTS AND AUTHORITIES

323070277v.4

Finally, the Agreement contained a valid class action waiver, and the enforceability of class action waivers is well settled. Accordingly, all of the class allegations must be dismissed.

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs Entered Into an Agreement Requiring Arbitration of All Employment-Related Disputes With F&D

F&D sells hard-surface flooring and related products in over 38 states through over 250 retail stores, including over 30 stores in California and numerous other stores in neighboring states. (Donovan Decl., ¶ 3; Quinones Decl. ¶ 9). On August 15, 2020, during her onboarding, Saldivar signed a document entitled "FLOOR & DECOR Arbitration Agreement California Only" in which she and F&D agreed to submit all employment-related disputes to binding arbitration. (Declaration of Mandi Donovan ("Donovan Decl."), ¶ 14-17; Exs. A and C.) In September 2022, F&D updated its Agreement, and on September 22, 2022, Saldivar signed the updated Agreement. (*Id.*) In May 2024, F&D updated its Agreement, and on June 1, 2024, Saldivar signed the updated Agreement. (*Id.*)

As part of his onboarding, on May 20, 2024, Aleman signed a six-page document entitled "FLOOR & DECOR Arbitration Agreement California Only" in which she and F&D agreed to submit all employment-related disputes to binding arbitration. (*Id.*, ¶¶ 14-17; Exs. B and D.) In May 2024, F&D updated its Agreement, and on July 8, 2024, Aleman signed the updated Agreement. (*Id.*)

The Arbitration Agreement provides in part that "[t]he Parties agree to arbitrate any employment-related dispute, cause of action, claim, or controversy … that arose out of or is in any way related to [Plaintiff's] employment relationship or the termination thereof [with F&D]." (Donovan Decl., ¶¶ 14-17; Exs. A-D.)

Plaintiffs and F&D agreed that "[a]rbitration … shall be the exclusive remedy for resolving any arbitrable disputes" and "waive[d] the right to a trial before a judge or jury in federal or state court in favor of arbitration". (*Id.*)

2

MEMORANDUM OF POINTS AND AUTHORITIES

The Arbitration Agreement further makes clear that arbitration "must and will take place on an **individual basis only** (as opposed to on a class, collective or non-individual representative basis). Class … arbitrations are not agreed to or permitted under this Agreement. You and [F&D] each are **waiving the right to initiate or participate in a class … action** for all employment-related disputes". (*Id.*) (emphasis added).

## B.    Plaintiffs Commenced This Action and Refused to Arbitrate

On November 13, 2025, Plaintiffs filed the Complaint in Superior Court. (Declaration of Gina Gi ("Gi Decl."), ¶ 3.) Besides Defendant filing its Answer and then removing the action to this court (Dkt. No. 1), no other litigation or discovery has taken place as of this filing. (Gi Decl., ¶¶ 4-5.)

Defendant's counsel informed Plaintiffs' counsel as early as January 13, 2026 regarding Defendant's intent to enforce the Arbitration Agreements, and provided Plaintiffs' counsel with copies of the Arbitration Agreements for consideration. (Gi Decl., ¶ 6.) On January 20, 2026, Plaintiffs' counsel indicated they would oppose because they believed the Agreements to be unenforceable under the transportation workers' exemption of the FAA. (*Id.*, ¶ 7.)

## C.    Aleman's Duties

During the time period relevant to this case, Aleman worked as a Warehouse Associate and Receiving Associate at F&D's retail store in Fresno, California. (Donovan Decl., ¶ 6). Aleman was never a delivery driver and he did not personally transport any products across state lines. (Declaration of Justin Mescall ("Mescall Decl."), ¶¶ 3, 5.) The Fresno store does not employ any delivery drivers to deliver products to customers. (*Id.*)

Aleman worked as a Warehouse Associate for just one week, from approximately May 16, 2024 until May 23, 2024. (Donovan Decl., ¶ 6.) During this time, his actual duties consisted of interacting with customers, helping them find products and answering their questions, checking inventory and orders, organizing and restocking the sales floor, and helping load products on customer vehicles in the parking lot. He also helped get products purchased online ready for in-person pick up or delivery. He did not regularly

MEMORANDUM OF POINTS AND AUTHORITIES

323070277v.4

arrange for the shipment of any online orders to out-of-state customers. (Mescall Decl., ¶ 3, Ex. A.)

Customers who request delivery can do so in one of two ways. First, if a customer places an order in-store and wishes to have the item delivered, F&D charges a delivery fee and arranges a third-party to pick up the order and deliver it to the customer. Second, in the rare instance that (1) a customer places an order online, (2) the ordered products are eligible for delivery, and (3) the customer selects third-party delivery, then that order is processed and prepared by the warehouse team, who reviews the order, wraps or packages the item, stages it in the loading bay, and schedules it for pick-up via a third-party courier. (Mescall Decl., ¶ 3.)

The "warehouse" within a Floor & Decor retail store is simply a storage area in the back of the retail store where local inventory is stored, either for use on the sales floor or for online purchase by local customers. This inventory is supplied by F&D's distribution center in Moreno Valley, California. Products at the retail store have already completed their supply chain journey and are positioned in the retail store for sale to local Fresno customers. (Mescall Decl., ¶ 4.)

Thereafter, from about May 24, 2024 until his separation from F&D on or about November 15, 2024, Aleman worked as a Receiving Associate. (Donovan Decl., ¶ 6.) The store receiving team is comprised of only three to four associates. The store usually receives no more than eight incoming delivery trucks each week, and it typically takes 45 minutes to 2 hours each day, at most, to offload products. The vast majority of offloading is conducted by the Receiving Supervisor, and not Receiving Associates like Aleman. (Mescall Decl., ¶ 5.)

Only approximately 10-15% of Aleman's actual time was spent offloading products from a truck. The remaining 85-90% of his time was spent moving products within the retail store, such as onto the sales floor or to racks in the "warehouse" for later placement on the sales floor, ensuring products inside the retail store are stored properly, rotating and replenishing inventory on the sales floor, ensuring products are organized for

counting and inspection, and ensuring the sales floor is full of product and ready for customers the next day. He did not regularly prepare for shipment orders of products to out-of-state customers. (Mescall Decl., ¶ 5, Ex. B.)

F&D has over 30 stores in California. The Fresno store is the only store in the Fresno area and exists for the purpose of serving local Fresno customers. Customers in neighboring states are served by F&D's many stores in Arizona and Nevada. (Mescall Decl., ¶ 6.)

**More than 93% of the Fresno store's annual sales are made in-person or are tied to a store visit; less than 7% are web orders.** (Mescall Decl., ¶ 8.) From 2023-2025, between 1.22% - 1.69% of annual Fresno store sales were delivered by third-party delivery services, and only 0.03% - 0.18% of all annual sales were delivered to out-of-state destinations. *Id.* Out-of-state deliveries are a miniscule percentage of the store's total annual sales and are, at most, a miniscule percentage of any Fresno store associate's job duties. *Id.*

### D.    Saldivar's Duties

During the time period relevant to this case, Saldivar worked as a Pro Services Department Assistant Department Manager, Command Center Associate, Inventory Control Specialist, Deco Department Manager, and Tile Department Manager at the La Quinta, California retail store. (Donovan Decl., ¶ 5.) Saldivar was never a delivery driver, never unloaded products from delivery trucks, and never moved pallets of products around by forklift within the store. (Declaration of Cindy Quinonez ("Quinonez Decl.") ¶¶ 3-8.) The store does not employ any delivery drivers to deliver products to customers. (*Id.*)

Saldivar worked as Pro Services Department Assistant Department Manager from the start of the relevant time period until on or about January 6, 2022. (Donovan Decl., ¶ 5.) This was a managerial and administrative role. Saldivar worked closely with the Pro Services Department Manager and was responsible for building and maintaining the relationship and sales with these customers, driving sales growth and profitability,

323070277v.4

analyzing market opportunities, developing price strategies, building and maintaining relationships with key customers, training and developing product sales specialists, and participating in marketing and promotional efforts. (Quinonez Decl., ¶¶ 3, 8, Ex. A.)

Saldivar worked as an Inventory Control Specialist from about January 21, 2022 until about July 14, 2022. (Donovan Decl., ¶ 5.) She made sure inventory counts were up-to-date and accurate, audited customer purchases awaiting pick-up, researched inventory-related discrepancies, and reviewed shipping and receiving documents for accuracy. Inventory at the La Quinta retail store is supplied by F&D's distribution center in Moreno Valley, California. Products that are received at the retail store have completed any interstate journey and are positioned for sale to local area customers. (Quinonez Decl., ¶¶ 4, 8, Ex. B.)

Saldivar was promoted to Deco Department Manager on about July 15, 2022, and worked in that role until about July 6, 2023. (Donovan Decl., ¶ 5.) This was a managerial and administrative role. Her duties consisted of customer service, ensuring departmental costs remain in budget, achieving sales goals, working on business reports, monitoring the hiring, training, development, and scheduling of staff, ensuring staff adherence to company policies, making sure there is sufficient inventory in the department, and assisting the store manager in handling personnel issues. (Quinonez Decl., ¶¶ 5, 8, Ex. C.)

Saldivar then worked as Tile Department Manager from about July 7, 2023 until about March 21, 2024. (Donovan Decl., ¶ 5.) This was a managerial and administrative role. Her duties consisted of customer service, ensuring departmental costs remain in budget, achieving sales goals, working on business reports, monitoring the hiring, training, development, and scheduling of staff, ensuring staff adherence to company policies, making sure there is sufficient inventory in the department, and assisting the store manager in handling personnel issues. (Quinonez Decl., ¶¶ 6, 8, Ex. C.)

Saldivar worked as a Command Center Associate for just two weeks in January 2022, and again from about March 22, 2024 until her resignation on or about December 19, 2024. (Donovan Decl., ¶ 5.) She spent 95% of her time in the Command Center, an

area in the store that is accessible to all customers. Her actual duties consisted of assisting customers with their in-store pick-up or with delivery. For those customers who pick up in-store, she checked them in and verified their identity. She also helped serve as a spotter for the warehouse associate who loaded product onto customer vehicles. For online web orders, she reviewed the order and created shipments in the system by inputting the delivery address and service load to help get the product ready for shipment, though it is the warehouse associate who actually retrieves the product and prepares it for pick-up. Saldivar also helped clean and stock products within the retail store. (Quinonez Decl., ¶¶ 7-8, Ex. D.)

The La Quinta store is the only F&D retail store in the Coachella Valley area and exists for the purpose of serving local customers. Customers in neighboring states are served by F&D's stores in Arizona and Nevada. (Quinonez Decl., ¶ 9.)

**More than 89% of the La Quinta store's annual sales are made in-person or are tied to a store visit; less than 11% are web orders.** (Quinonez Decl., ¶ 11.) From 2023-2025, between 1.72 - 2.22% of annual La Quinta store sales were delivered by third-party delivery services, and only 0.05% - 0.28% of all annual sales were delivered to out-of-state destinations. *Id.* Out-of-state deliveries are a miniscule percentage of the store's total annual sales and a miniscule percentage of any La Quinta store associate's job duties. *Id.*

## III.  LEGAL ARGUMENT

### A.  The FAA And U.S. Supreme Court Provide For Enforcement Of Agreements To Arbitrate

The FAA "was enacted . . . in response to widespread judicial hostility to arbitration agreements" and state law rules hostile to arbitration agreements are preempted by the FAA. *Concepcion*, 563 U.S. 333, 339, 343-344 (2011) (internal citations omitted). The "principal purpose" of the FAA is to "ensur[e] that private arbitration agreements are enforced according to their terms," *Id.* at 344, and arbitration agreements "must be rigorously enforced." *Perry v. Thomas*, 482 U.S. 483, 490 (1987).

MEMORANDUM OF POINTS AND AUTHORITIES

The United States Supreme Court has described the FAA "as reflecting both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." *Id*. at 339 (internal quotations omitted).

This purpose is readily apparent from the FAA's text. Section 2 makes arbitration agreements "valid, irrevocable, and enforceable" (subject to a savings clause). 9 U.S.C. § 2. Section 3 requires courts, at a party's request, to stay litigation of arbitral claims pending arbitration of those claims "in accordance with the terms of the agreement." 9 U.S.C. § 3. Finally, Section 4 requires courts to compel arbitration "in accordance with the terms of the agreement" upon the motion of either party. 9 U.S.C. § 4. "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp*., 460 U.S. 1, 24-25 (1983).

### B.    The FAA Applies to Employment Contracts Involving Interstate Commerce

The FAA applies to contracts "evidencing a transaction involving commerce" as the one here. *See* 9 U.S.C. § 2; *see also Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273-74, 277 (1995) (the term "involving" commerce "signals an intent to exercise Congress' commerce power to the full"). Such contracts include employment contracts. *Circuit City Stores, Inc. v. Adams* ("*Circuit City*"), 532 U.S. 105, 113-14, 119-22 (2001) (application of FAA to employment contracts, seminally defining "transportation worker," and compelling arbitration for a retail worker).

The FAA governs arbitration agreements involving interstate commerce, like the one here, because F&D has stores in 36 states across the country and sells flooring products to customers nationwide. (Donovan Decl., ¶ 3.) *See Giuliano v. Inland Empire Pers., Inc.*, 149 Cal. App. 4th 1276, 1286-87 (2007) (employer's multistate presence is evidence of interstate commerce). F&D purchases products from outside of California and ships products to customers outside of California. (*Id*.) The Arbitration Agreement also expressly provides that "[F&D] is engaged in interstate commerce" and that the

8

MEMORANDUM OF POINTS AND AUTHORITIES

Agreement "shall be governed by the Federal Arbitration Act." (*Id.*, ¶ 14; Exs. A-B.) Accordingly, the FAA governs the Arbitration Agreement.

### 1. The Parties Entered Into a Valid Arbitration Agreement that Covers the Claims

When considering a motion to compel arbitration, the trial court's role is limited to "two gateway issues" of arbitrability: (1) does a valid agreement to arbitrate exist; and, if it does, (2) does the arbitration agreement encompass the dispute or claims at issue? *Omar v. Ralphs Grocery Co.*, 118 Cal. App. 4th 955, 960 (2004). "If the response is affirmative on both counts, then the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000). The response to both questions here is a resounding yes.

### 2. Plaintiffs' Claims Are Within The Scope Of The Arbitration Agreement

Plaintiffs and F&D agreed "to arbitrate any employment-related…claim, or controversy…that arose out of or is in any way related to [Plaintiff's] employment relationship or the termination thereof [with F&D]." (Donovan Decl., ¶14; Exs. A-B.)

The Arbitration Agreement covers any claim "that arose out of, or is in any way related to, the employment relationship" and includes claims of statutory violations, including, but not limited to, claims under "the California Labor Code, the California Wage Orders, the California Business and Professions Code section, 17200 et seq., … and Claims under any other federal, state or local law." (*Id.*)

Plaintiffs' case clearly falls within the scope of the Arbitration Agreement. Plaintiffs' Complaint is entirely predicated on violations of the Labor Code arising out of their employment with F&D. Plaintiffs are required to arbitrate their claims.

### C. The Transportation Workers' Exemption Does Not Apply to Plaintiffs

Section 1 of the FAA creates a narrow exemption for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. The issue of whether a worker is exempt under FAA section 1

"require[s] a case-by-case factual determination, with the **party opposing the motion** to compel arbitration **bearing the burden** to demonstrate that the exemption applies." *Betancourt v. Transportation Brokerage Specialists, Inc.*, 62 Cal. App. 5th 552, 559 (2021) (emphasis added).

### 1.    The Transportation Worker Exemption Is Narrow

The U.S. Supreme Court has counseled that the transport workers' exception must be given a "narrow construction" consistent with the FAA's "pro-arbitration purposes." *Circuit City*, 532 U.S. at 106, 111 (sales employee who worked at a retail store for Circuit City is subject to the reach of the FAA, and holding the section one exemption is limited to transportation workers and not general employees). The U.S. Supreme Court and state appellate courts define "transportation workers" as "workers actually engaged in the movement of goods in interstate commerce." *Bissonnette*, 601 U.S. at 252-253, 256 (section one has never been understood to define the class of exempt workers in such limitless terms as to sweep in "virtually all workers who load or unload goods – from pet shop employees to grocery store clerks" and that instead "§ 1 is limited to transportation workers" and those transportation workers must be "actively engaged in transportation of goods across borders"); *Nieto v. Fresno Beverage Co., Inc.*  33 Cal. App. 5th 274, 281 (2019); *see also Romero v. Watkins & Shepard Trucking, Inc.,* 2020 WL 5775180, at *6 (C.D. Cal. July 10, 2020) (the exemption "is narrow.") The words "engaged in commerce" is understood to have a more limited reach than something "affecting commerce" or "involving commerce." *Circuit City,* 532 U.S. at 114-115.

### 2.    Plaintiffs Are Retail Workers, Not Transportation Workers

To assess whether Plaintiffs are transportation workers, the Court first "defin[es] the relevant 'class of workers' to which [Plaintiff] belongs." *Southwest Airlines Co. v. Saxon* ("Saxon"), 596 U.S. 450, 455 (2022).

Plaintiffs are both retail workers, exclusively working within F&D's retail stores. Their assignments were not those of transportation workers. At various times, their actual duties were comprised of some combination of the following: customer service, hiring,

MEMORANDUM OF POINTS AND AUTHORITIES

training, and development of staff, ensuring coverage for shifts, setting up the showroom, inventory count and management, sales, budgeting, reporting, managing customer pick-ups, loading orders onto customer vehicles in the parking lot, stocking and organizing products inside the retail store, processing online orders and getting them ready for pick up, and as to Aleman only for about 10-15% of the time, unloading products from trucks and moving them into the retail store. Neither of the Plaintiffs were ever delivery drivers. (*See* Mescall and Quinonez Declarations.) Plaintiffs' exclusively retail roles are relevant to assessing the next step of the inquiry, which looks at whether they fall within a class of workers who are "engaged in foreign or interstate commerce." 9 U.S.C. § 1. As discussed further below, the answer to that inquiry is decidedly no.

### 3. Plaintiffs Are Not Actively Engaged in Interstate Commerce As The Products They Handled Have Come to Rest

Plaintiffs will be unable to meet their burden in establishing that they "play a **direct and 'necessary role** in the free flow of goods' across [foreign or interstate] borders." *Bissonnette,* 601 U.S. at 247, *citing Saxon*, 596 U.S. 450, 455-456 (2022) (emphasis added.)

As retail workers, the products that Plaintiffs encountered during their work had come to rest. Once goods reach a local retail store, the unbroken stream of interstate commerce ceases and subsequent local customer purchases are not part of an interstate chain. *Immediato v. Postmates, Inc.* ("*Immediato*"), 54 F.4th 67, 77-78 (1st Cir. 2022) is particularly instructive. That case involved "couriers who deliver both meals prepared at local restaurants and goods sold by local retailers." *Id.* at 74. The Court held "the interstate journey terminates when the goods arrive at the local…retailers" and "when the couriers set out to deliver customer orders, they do so as part of entirely new and separate transactions." *Id.* The Court found this interpretation "consistent with the [U.S. Supreme] Court's construction of section 1's residual clause in *Circuit City*," *Id.* at 78, finding the "record is luminously clear that those new and separate transactions are intrastate in nature as **almost all deliveries made by the couriers…are completed within the state**

**in which the order is placed**. In a nutshell, couriers making deliveries from local businesses are transporting goods as part of local intrastate commerce." *Id.* (Emphasis added.)  The gap between transportation workers and Plaintiffs is wider here than in *Immediato*, as Plaintiffs performed all work within the four corners of a single retail store serving the local market.

Similarly, in *Fomby v. CSC ServiceWorks, Inc.* ("Fomby")*,* 2024 WL 3580824 (N.D. Cal. July 29, 2024), plaintiff worked as a delivery driver and appliance installer, transporting defendant's equipment. *Id.* at *1. Defendant acquired laundry equipment and stored the same in its warehouses, and only after an individual customer leased the equipment would plaintiff deliver it to the customer. *Id.* at *7. The court held plaintiff was not involved in a single, unbroken stream of interstate commerce because the **individual customers' subsequent orders constituted** "**new transactions**." *Id.* (emphasis added.)  The local retail transactions that Plaintiffs enabled at F&D retail stores were similarly disconnected from the stream of interstate commerce.

In *Shugars v. Walmart Inc.,* 2025 WL 786348 (N.D. Cal. March 2025), the plaintiffs worked for retailer Walmart as "spark drivers" who fulfilled same-day delivery orders. *Id.* at *1. The court ruled the drivers were "engaged in purely local transactions between a particular retail store and nearby customers" and that the goods were "not in a 'continuous' flow of interstate commerce as any interstate transactions involving the goods "have already concluded by the time Spark Drivers pick up the goods from a local Walmart store and deliver them to a nearby customer." *Id.* at *5-6; *see also Shelton v. Delivery Drivers, Inc.,* 2023 WL 2629027, at *3 (C.D. Cal. Jan. 31, 2023) (the exemption does not apply because "spark drivers transport local merchandise to local customers"). This case is even clearer as Plaintiffs were never delivery drivers.

Like in *Immediato, Fomby*, and *Shugars*, F&D's products have concluded their journey upon reaching the F&D retail stores. These products are then made available in subsequent transactions to residents of the Fresno and Coachella Valley area. (Mescall Dec. ¶ 6; Quinonez Dec. ¶ 9.) Moreover, the hard-surface flooring products that F&D

12

**MEMORANDUM OF POINTS AND AUTHORITIES**

sells is sold almost exclusively through in-person transactions at F&D retail stores. (Mescall Decl., ¶ 7; Quinonez Decl., ¶ 10.) The vast majority of annual sales are to in-store customers or tied to a store visit- more than 93% for Fresno and more than 89% for La Quinta, demonstrating that most purchases are purely intrastate transactions. (Mescall Dec. ¶ 8; Quinonez Dec. ¶ 11.) As discussed above, Plaintiffs retail jobs existed to support these local retail transactions.

Moreover, only 0.03 to 0.28% of either stores' annual sales were attributable to out-of-state deliveries. (Mescall Decl. ¶ 8; Quinonez Decl. ¶ 11.) Very little of either Plaintiffs' actual time was spent preparing orders for pick-up by courier for out-of-state delivery. The only role Saldivar held that dealt with outbound shipments was that of Command Center Associate, a role she held for just two weeks in 2022 and nine months in 2024. The total time she spent actually inputting shipment information into the system for out-of-state deliveries is miniscule given the vast majority of the store's sales are in-store sales. (Quinonez Decl., ¶¶ 3-9, 11.) Similarly, Aleman only worked as a Warehouse Associate for one week. While some of his duties in that short time included getting web orders ready for pick up by courier, the total time he spent engaging in such activity during that one week for out-of-state deliveries was microscopic given the vast majority of that store's sales are in-store sales, and only a small percentage of the remaining delivered sales were out-of-state. (Mescall Decl., ¶¶ 3, 8.)

Any tasks that either Plaintiff engaged in that involved preparing products for out-of-state delivery comprised a miniscule portion of their total duties given the extremely small quantity of such sales at either store. This would not be enough to render them transportation workers. *See e.g., Lenz v. Yellow Transp., Inc.,* 431 F.3d 348-350, 352-353 (8th Cir. 2005) (the Court looked at his "job duties as a whole" and found his "central task" was not transportation related); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 505-506 (4th Cir. 2002) ("**the evidence does not show [] that a majority or even a plurality of the plaintiffs' daily assignments were in transportation related industries**" and that to apply the term "transportation workers" to employees "assigned to even a single

MEMORANDUM OF POINTS AND AUTHORITIES

transportation-related job during [their] entire tenure at the company" would **stretch reason "past the breaking point"**) (emphasis added).

In *Capriole v. Uber Technologies, Inc.*, 7 F.4th 854, 864, 871 (2021), the Ninth Circuit held that even Uber drivers who occasionally fulfilled trips that took passengers across state lines were not engaged in interstate commerce. The Court found that "**only 2.5% of 'all trips** fulfilled using the Uber Rides marketplace…**started and ended in different states**'" and that "[o]verall, interstate trips, even when combined with trips to the airport, represent a very small percentage of Uber rides, and **only occasionally implicate interstate commerce**." *Id.* at 864. (Emphasis added.) Thus, "interstate movement cannot be said to be a 'central part of the class members' job description.'" *Id.* at 865. Plaintiffs here are even further removed since neither Plaintiff was a rideshare driver that drove any person or any product across state lines. Rather, they were always based out of the retail store that existed to serve local customers. (Mescall Dec. ¶ 6; Quinonez Dec. ¶ 9.)

It also does not matter that Aleman, as a Receiving Associate, helped unload delivery trucks 10-15% of the time and then moved them into the retail store since as discussed earlier, those products have concluded their journey. (Mescal Decl., ¶ 5); *See Lopez v. Cintas Corp.*, 47 F.4th 428, 432-433 (5th Cir. 2022) (holding that "once goods arrived at the [] warehouse, **anyone interacting with those goods was no longer engaged in interstate commerce**" and that the local delivery drivers are distinguishable from the airline ramp workers in *Saxon*.)

Plaintiffs were not involved in the manufacture and assembly of products at the beginning of the journey or at the heart of the supply chain that would then be distributed across state lines. *See, e.g., In re Tesla Employee Data Breach Litigation*, 2025 WL 315416 at *1-2 (N.D. Cal. Jan. 2025) (holding plaintiffs were not transportation workers even though it was "certainly likely that the cars" that plaintiffs built on the assembly line were "subsequently shipped across state lines to customers, the critical factor … is that plaintiffs were involved in the manufacture of vehicles, and not in their transport or

14
MEMORANDUM OF POINTS AND AUTHORITIES

delivery in interstate commerce.") Rather, Plaintiffs worked in retail positions where products were at the end of their journey and made available for local area customers. The Fresno store is hundreds of miles away from the Nevada border, and the La Quinta store is more than 100 miles away from the Arizona border. Customers in neighboring states do not rely in any meaningful way on either store as they are served by F&D's other stores in those states. (Mescall Decl., ¶ 6; Quinonez Decl, ¶ 9.) To expand coverage to Plaintiffs simply because they touched or were in proximity to products that may have at some earlier point been in interstate transport would essentially broaden the exemption to every retail worker in the country, which is incongruous with the broad arbitrability of disputes authorized by Section 2 of the FAA. *See, e.g., Bissonette*, 601 U.S. at 256 (disclaiming that the transportation exemption applies to "all workers who load or unload goods—from pet shop employees to grocery store clerks"); *Hill v. Rent-A-Ctr., Inc*., 398 F.3d 1286, 1290 (11th Cir. 2005) ("To broaden the scope of [the exemption] to encompass…a worker employed by a company whose business dealings happen to cross state lines, would allow § 1's exception to swallow the general policy.")

Defendant anticipates Plaintiffs will rely on *Rittman v. Amazon.com, Inc.,* 971 F. 3d 904, 907 (9th Cir. 2020), but *Rittman* involved Amazon Flex delivery drivers who picked up packages from Amazon warehouses and sometimes returned to the warehouse with packages undelivered. The Court held the packages are goods that remain in the stream of interstate commerce until they are delivered. *Id.* at 915. Rittman is distinguishable on its face since the class of workers there are drivers whose central duties required them to pick up packages and deliver them. There is no dispute that Plaintiffs here were never delivery drivers. The Court in *Immediato* correctly distinguished last mile delivery drivers for Amazon, like those in *Rittman*, who played an active role in completing interstate package deliveries, and found those to be in contrast with the couriers in *Immediato*, who delivered retail store goods that have "already exited the flow of interstate commerce" to customers. *Immediato*, 54 F.4th at 80. The court in *Shugars* also correctly distinguished *Rittman*, noting the exemption did not apply to

323070277v.4

Walmart spark drivers since the interstate transactions had already been concluded by the time the goods were picked up at the local Walmart store by spark drivers. *Shugars*, 2025 WL 786348, at * 4-5. Similarly here, the products at the F&D retail stores had already completed any interstate journey. Any subsequent deliveries were predominantly local intrastate transactions. Accordingly, the transportation workers' exemption does not apply.

### D.    The Arbitration Agreement Is Procedurally and Substantively Conscionable

The Arbitration Agreement is also enforceable because it includes basic procedural and remedial protections so that a plaintiff may effectively pursue statutory rights. *Armendariz v. Foundation Health Psychare Services, Inc* ("*Armendariz*"), 24 Cal. 4th 83, 96-97 (2000). The California Supreme Court held in *Armendariz* that claims are arbitrable when the arbitration agreement (1) provides for a neutral arbitrator; (2) allows adequate discovery; (3) requires a written award; (4) does not limit remedies; (5) does not require the employee to pay costs unique to arbitration; and (6) provides a "modicum of bilaterality." *Id.* at 102-13, 117.  The Arbitration Agreement satisfies these factors.[1]

### 1.    The Arbitration Agreement provides for a neutral arbitrator.

The Arbitration Agreement provides for the selection of a single arbitrator "with the Judicial Arbitration and Mediation Services, Inc. ("JAMS") in accordance with the employment arbitration rules for JAMS." (Donovan Decl., ¶ 14; Exs. A-B; Gi Decl., ¶ 8, Ex. A.) The JAMS rules expressly require an arbitrator to be neutral. (*Id.*) The Arbitration Agreement does not circumvent the arbitrator disclosure and disqualification rules under California law, which themselves help to ensure arbitrator neutrality. *See* Cal. Civ. Proc.

---

[1]/ *Under Concepcion*, courts may not invalidate arbitration agreements under state law applicable only to arbitration contracts. *Concepcion*, 131 S. Ct. at 1747.  The *Armendariz* standard applies only to arbitration contracts. Thus, analysis of the *Armendariz* factors should not be necessary, but even if *Armendariz* applies, the Agreement still satisfies all of these requirements.

Code §§ 1281.85-1281.96; Ethics Standards for Neutral Arbitrators, Cal. Rules of Court, Rules 6-12.

### 2.    The Arbitration Agreement provides for adequate discovery.

The Arbitration Agreement addresses that discovery should be conducted in conformity with current JAMS arbitration discovery rules and may be as expansive as the discovery permitted under "the applicable procedural rules of the State of California." (Donovan Decl., ¶ 14; Exs. A-B.) The Arbitration Agreement further provides that "[t]he arbitrator may issue subpoenas to compel the testimony of third-party witnesses or the production of documents." (*Id.*)

### 3.    The Arbitration Agreement provides for a written arbitration award.

The Arbitration Agreement states that "[t]he arbitrator shall issue a written decision . . . . with factual findings, reasons given, and evidence cited to support the award." (Donovan Decl., ¶ 14; Exs. A-B.) The JAMS Rules similarly require a written arbitration award that satisfies the *Armendariz* requirement. (Gi Decl., ¶ 8, Ex. A.)

### 4.    The Arbitration Agreement does not limit remedies.

The Arbitration Agreement permits the arbitrator to award "remedies as could be awarded by a court under the applicable substantive law which may include injunctive or other equitable relief." (Donovan Decl., ¶ 14; Exs. A-B.) This includes awarding attorneys' fees. *See id.* ("[i]f the applicable law affords the prevailing party's attorneys' fees and costs, then the arbitrator shall apply the same standards a court would apply to award such fees and costs")

### 5.    The Arbitration Agreement does not impose additional costs for Plaintiff.

The Arbitration Agreement does not impose additional costs on the employee. It provides that F&D "shall pay all costs uniquely attributable to arbitration, including the administrative fees and costs of the arbitration" to the extent required by applicable law. (Donovan Decl., ¶ 14; Exs. A-B.)

MEMORANDUM OF POINTS AND AUTHORITIES

323070277v.4

6.    **The Arbitration Agreement is bilateral.**

The Arbitration Agreement is not lacking in mutuality as both F&D and Plaintiffs agreed and are bound to pursue their claims related to the employment relationship through arbitration. (Donovan Decl., ¶ 14; Exs. A-B.) Since the Arbitration Agreement applies equally to claims brought by the other party, it is mutual and enforceable. *24 Hour Fitness v. Super. Ct.*, 66 Cal. App. 4th 1199, 1213 (1998).

Accordingly, the Arbitration Agreement expressly satisfies the *Armendariz* requirements.

### E.    The Arbitration Agreement Is Not Unconscionable

For an arbitration agreement to be rendered unenforceable on unconscionability grounds, it must be *both* procedurally *and* substantively unconscionable. *Armendariz*, *supra*, 24 Cal. 4th at 114. Procedural unconscionability focuses on "oppression" and "surprise" and substantive unconscionability focuses on whether the agreement is "overly harsh" or "one-sided." *Armendariz*, 24 Cal. 4th at 114.

The unconscionability elements are considered on a sliding scale. *McManus v. CIBS World Mkt. Corp.*, 109 Cal. App. 4th 76, 91 (2003) ("the more procedurally oppressive…the less evidence of substantive unconscionability is required.") Thus, even if an agreement is procedurally unconscionable, it may still be enforceable if there is not a considerable degree of substantive unconscionability (or vice versa). *Id*. Plaintiffs cannot show the Arbitration Agreement is procedurally or substantively unconscionable.

1.    **Plaintiffs cannot establish procedurally unconscionability.**

For procedural unconscionability, the relevant inquiry is whether the arbitration agreement is unreasonably oppressive or surprising. *Fittante v. Palm Springs Motors, Inc.*, 105 Cal. App. 4th 708, 711 (2003). There is no indication that Plaintiffs were subjected to oppressive tactics.

In addition, the fact that an arbitration agreement is a condition of employment is not dispositive. *Lagatree v. Luce, Forward, Hamilton & Scripps*, 74 Cal. App. 4th 1105,

18

MEMORANDUM OF POINTS AND AUTHORITIES

1127 (1999) ("arbitration agreement is not rendered unenforceable just because it is required as a condition of employment or offered on a 'take it or leave it' basis…").

Likewise, Plaintiffs cannot plausibly claim that they were "surprised." Surprise involves the extent to which the terms of the agreement are "hidden in a prolix printed form" drafted by the party seeking to compel arbitration. *Villa Milano Homeowners Ass'n. v. Il Davorge*, 84 Cal. App. 4th 819 (2000) (arbitration language that appeared in regular typeface on 67th page of 70-page document was "surprise" to party opposing arbitration). Here, the Arbitration Agreement was not "hidden," since it was presented as a standalone document, separate from any other documents reviewed during onboarding, it was unambiguously titled in red text and in large sized font with a cover page "Arbitration Agreement - California Associates" and again in black and bold text on the top of the following page: "**Agreement for Arbitration of Disputes for California Only.**" The Arbitration Agreement is neatly typed and easy to read, with bolded and capitalized text and discrete paragraphs and headings throughout. The Arbitration Agreement informed Plaintiff immediately before the signature block that:

> **BY SIGNING BELOW OR ELECTRONICALLY, I, THE EMPLOYEE, KNOWINGLY AND FREELY AGREE TO THIS MUTUAL AGREEMENT TO ARBITRATE ANY CLAIMS BETWEEN ME AND THE COMPANIES THAT OTHERWISE COULD HAVE BEEN BROUGHT IN COURT AND/OR BEFORE A JURY.**

(Donovan Decl., ¶ 14; Exs. A-B.)

Accordingly, there was no surprise or oppression, and the Arbitration Agreement is not procedurally unconscionable.

### 2.    Plaintiffs cannot establish substantive unconscionability.

The absence of procedural unconscionability alone requires enforcement of the Arbitration Agreement. However, even if the Court found evidence of procedural unconscionability, the Arbitration Agreement is not substantively unconscionable.

To find an agreement substantively unconscionable, the terms of the agreement must be so one-sided as to "shock the conscience." *Walnut Producers of California v.*

19

MEMORANDUM OF POINTS AND AUTHORITIES

*Diamond Foods, Inc.*, 187 Cal. App. 4th 634, 647-48 (2010). The most important consideration is whether mutuality exists. *See Armendariz,* 24 Cal. 4th at 83.

Here, the Arbitration Agreement provides the parties with mutual and equal rights. (Donovan Decl., ¶ 14; Exs. A-B.) The terms are mutually binding on both F&D and Plaintiffs, and each are obligated to submit all covered disputes to arbitration. (*Id.*) Likewise, F&D and Plaintiffs are entitled to the same discovery and bound by the same procedural rules. (*Id.*) Consequently, the Arbitration Agreement provides F&D and Plaintiffs with the same rights and protections. This mutuality, combined with the Arbitration Agreement's satisfaction of the *Armendariz* requirements, establishes that the Arbitration Agreement is not substantively unconscionable.

### 3.     Any unconscionable terms can be severed.

Even if the Court were to find any part of the Agreement unconscionable, it may sever those parts and enforce the remainder, pursuant to the severability provision in Section 6 of the Agreement. (Donovan Decl., ¶ 14, Exs. A-B.) The Court also has the authority to sever any unconscionable terms pursuant to Civil Code sections 1599 and 1670.5(a). This court may, when faced with an unconscionable contract provision, "enforce the remainder of the contract without the unconscionable clause." *Armendariz*, 24 Cal. 4th at 121-22. A court may refuse to enforce an arbitration agreement only when an agreement is "permeated by unconscionability." *Id*. at 122. The Arbitration Agreement here contains no unconscionable terms. Even if it did, unconscionability certainly does not "permeate" it. Severing any unconscionable contract provision, therefore, would be appropriate.

### F.     The Class Allegations Must Be Dismissed Because The Arbitration Agreement Contains A Valid Class Action Waiver.

The enforceability of class action waivers is well settled. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1619 (2018) ("Epic Sys.") ("Congress has instructed federal courts to enforce arbitration agreements according to their terms—including terms providing for individualized proceedings and holding class action waivers do not violate the National

20

**MEMORANDUM OF POINTS AND AUTHORITIES**

Labor Relations Act and must be enforced"); see also *AT&T Mobility LLC v. Concepcion* ("*Concepcion*"), 563 U.S. 333, 344, 348-352 (2011) (class waiver provisions are enforceable under the FAA and the "FAA preempts any state laws conditioning the enforceability of arbitration provisions on the availability of class or collective procedures because such rules interfere with the fundamental goal of the FAA.") Here, the Agreement contains a valid class action waiver that expressly states:

> [A]ny arbitration under this Agreement must and will take place on an individual basis only (as opposed to on a class, collective or non-individual representative basis)… You and the Company each are waiving the right to initiate or participate in a class … action for all employment-related disputes and/or Claims.

(Donovan Decl., ¶¶ 14, 17; Exs. A-B.) Accordingly, Plaintiffs are barred from asserting the class action and class UCL claims, and the Court should dismiss Plaintiffs' class claims.

## IV.    <u>CONCLUSION</u>

F&D respectfully requests the Court compel Plaintiffs to binding arbitration on their individual claims and dismiss the class claims.

DATED: February 11, 2026                    Respectfully submitted,

SEYFARTH SHAW LLP


By: */s/ Gina Gi*
Daniel Whang
Gina Gi
Attorneys for Defendant
FLOOR AND DECOR OUTLETS OF
AMERICA, INC.

21
MEMORANDUM OF POINTS AND AUTHORITIES

323070277v.4

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is 601 South Figueroa Street, Suite 3300, Los Angeles, California  90017-5793.

On **February 11, 2026**, I served the within document(s):

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL ARBITRATION AND TO DISMISS PLAINTIFFS' CLASS ACTION CLAIMS**

☐ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Los Angeles, California, addressed as set forth below.

☒ by transmitting the document(s) listed above, electronically, via the e-mail addresses set forth below.

| | |
|---|---|
| **MOON LAW GROUP, PC**<br>**Kane Moon, Esq**<br>**Allen Feghali, Esq.**<br>**Enzo Nabiev, Esq.**<br>**Michael Braud, Esq.**<br>725 South Figueroa Street, Suite 3100<br>Los Angeles, California 90017<br>Telephone No.: (213) 232-3128<br>Facsimile No.:  (213) 232-3125<br>Email: kmoon@moonlawgroup.com<br>Email: afeghali@moonlawgroup.com<br>Email: enabiev@moonlawgroup.com<br>Email: mbraud@moonlawgroup.com | Attorneys for Plaintiffs<br>RIKKI SALDIVAR and FRANCISCO ALEMAN, individually, and on behalf of all others similarly situated |

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **February 11, 2026**, at Los Angeles, California.

_/s/ Kevin Sar_
Kevin Sar

PROOF OF SERVICE